Filed 5/18/21  P. v. Lemons CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Sacramento)

----

| | |
|---|---|
| THE PEOPLE, | C082451 |
| Plaintiff and Respondent, | (Super. Ct. No. 15F00649) |
| v. | |
| GLEN DALE LEMONS, | |
| Defendant and Appellant. | |

A jury found defendant Glen Dale Lemons guilty of sexually molesting two sets of underage sisters.  Sentenced to a determinate term of 50 years and an indeterminate term of 135 years to life, defendant appeals, contending the trial court erred in excluding opinion testimony, prohibiting defendant from cross-examining a witness, improperly admitting evidence of uncharged sex acts, and committed sentencing error.  We shall affirm the judgment.

1

## FACTUAL AND PROCEDURAL BACKGROUND

An amended information charged defendant with committing a lewd and lascivious act upon M., a child under the age of 14 (counts one & two) (Pen. Code, § 288, subd. (a));[1] committing a lewd and lascivious act upon S., a child under the age of 14 (count three) (§ 288, subd. (a)); committing a forcible lewd and lascivious act upon A., a child under the age of 14 (counts four & five) (§ 288, subd. (b)(1)); committing a forcible lewd and lascivious act upon B., a child under the age of 14 (counts six, eight & nine) (§ 288, subd. (a)); and committing a forcible lewd and lascivious act upon B., a child under the age of 14 (count seven) (§ 288, subd. (b)(1)).

The information also alleged defendant committed sexual offenses against multiple victims and had sustained five prior prison terms. (§§ 667.61, subd. (e)(4), 667.5, subd. (b).) The court granted defendant's request to bifurcate the prior conviction allegations.

A jury trial followed. The following evidence was introduced at trial.

**M. and S.**

In 2014, M. and S. resided in Sacramento with their parents. Their mother had a daughter from a previous relationship with defendant. Their father met defendant a few years previously and the two became friends. Defendant worked on their father's computer and car and visited every couple of weeks with his friend Jenna. The pair would spend the night with the family. M. and S.'s father never saw anything wrong occur between defendant and his daughters.

---

[1] All further statutory references are to the Penal Code unless otherwise designated.

2

***M.***

M., age eight at the time of the trial, testified defendant often visited. He and his girlfriend Jenna were friends with her parents. When defendant visited he touched her four to six times.

M. had not seen defendant in a year and could not identify him at trial. One of her strongest recollections was, at age six, when she was in first grade. Defendant sat next to her on the couch. He pulled her pants and panties down and touched the place between her legs that she referred to as her "tutu" with his fingers. M. was frightened; defendant did not say anything when he touched her. She pulled her pants up and went to her mother's bedroom. A few months later, M. told her mother about defendant's actions.

On another occasion, M. played in the garage with S. M. was in first grade and six or seven years old. Defendant touched M. on her "tutu" over her clothing. S. was playing nearby. M. told her mother about the incident about a week after she told her about the previous incident. She also told defendant's daughter. S. told M. defendant also touched her.

***S.***

S., six years old at trial, testified that when she was four or five years old defendant touched her. Defendant and Jenna came to the house. S. sat on defendant's lap while they watched television. He touched her "tutu" with his finger on the outside of her panties. S. called her vagina "tutu." Defendant did not say anything or move his finger, but S. said it tickled. After S. got off defendant's lap, she told her mother what happened.

***M. and S.'s Father***

M. and S.'s father testified that once when defendant visited, he was playing on his computer while defendant and S. watched television on the couch. He heard S. say "my mama told me that whenever someone touches me on my tutu that I should tell her

3

right away." At the time, he forgot to ask S. what happened, but later told his wife about the incident. As the two talked to S., M. said she had the same problem with defendant. M. said defendant touched her a couple of times: once in the backyard and once in a truck. The conversation took place a few days before Thanksgiving. They notified authorities on December 2, 2014, after Thanksgiving.

About a month later, defendant came to the house and M. and S.'s father told him he could not talk to him. He did not see defendant again until trial. He liked defendant and missed him. He also stated that, as kids, M. and S. were not always honest.

### *Police Investigation*

On December 2, 2014, Deputy Sam Bates interviewed M. She told him a family friend touched her between the legs on her "tutu" in the living room. The friend told her not to tell anyone, "It was a family secret."

During another incident, defendant touched her inside and outside her pants in the garage. She told defendant's daughter about what happened, but did not remember what she said. She did not discuss the touching in the backyard or in a truck.

Deputy Rodolfo Roque interviewed S. She stated that while sitting on defendant's lap, he touched her groin. She called it her "tutu" and pointed to her vagina.

M. and S.'s father told an officer that he did not say anything about S.'s comments regarding defendant for several weeks. On November 25, 2014, while watching television with his wife, he discussed S.'s comments about defendant. M. said, "Glen did that to me too a couple of times and told me it's a secret."

### *SAFE Interviews*

In a January 2015 interview with a sexual assault forensic examiner (SAFE), M. said defendant pulled her pants and panties down while they sat on the couch. He touched her "tutu" with his hand when she was six years old. M. was scared. Although defendant told her it was a secret, she told on him. M. also said defendant touched "at

4

her pants" in the garage when S. was there.  S., in her SAFE interview, said defendant touched her "tutu" on top of her clothing while they sat on the couch.  The jury heard tapes of both interviews.

### *Defendant's Conversation with M. and S.'s Mother*

In May 2015, defendant spoke to M. and S.'s mother by phone from jail.  She said, "I forgive you."  Defendant responded, "I'm sorry."  Later defendant said, "They can't do something if there is nothing that has happened."  The jury heard the tape of the phone call.

## A. and B.

A. and B.'s mother and defendant married in 2000 and separated in 2002.  They were still legally married at the time of trial.  The couple lived in a studio apartment in Roseville, an apartment above a garage in Roseville, and a townhouse in Yuba City.  She had three daughters from previous relationships: Mi., A., and B.  The girls stayed with their mother and defendant on summer breaks and holidays.  When her daughters told her about defendant's molestations, she did not contact authorities.

### *A.*

At trial, A. was 27 years old.  When she was 10 or 11, she visited defendant and her mother at their studio apartment with her sister B.  Mi. was also often there.  A. and B. slept on a pullout bed with sheets separating them from defendant and their mother in their bed.

Once, during a visit, A. woke up with a bloody nose.  She looked for something to stop the bleeding and defendant approached her, naked with a toilet paper roll.  She took the toilet paper and blew her nose.  Defendant grabbed her left hand, brought it towards his penis and told her it was okay to touch his penis.  After she jerked her hand away, defendant grabbed it and placed it on his penis.  He moved her hand up and down in a "cupping motion."

5

A. was sitting on the pullout bed, with B. asleep next to her. After A. began to cry, defendant became frustrated and released her hand. She tried to go back to sleep. The following day she kept her distance from defendant. She did not tell anyone what happened.

She finally told her mother that defendant made her touch him after her sister reported defendant's acts against her a couple of years later. Her mother did not contact the police. A. talked to her sisters prior to talking to the police. Both said defendant had molested them.

**B.**

B., 22 years old at the time of trial, testified she met defendant when she was in elementary school after he married her mother. B. stayed with the couple during summer vacation and school breaks.

One day, while her mother was at work, B. was lying on her mother's bed in the Roseville apartment. She was five or six years old. Defendant entered wearing pulled down shorts, exposing and touching his penis. Defendant got on the bed with B. and continued touching himself. She pretended to sleep. Defendant touched her vagina under her nightgown and underwear, but did not penetrate her with his finger. He touched his penis with the other hand and asked her if she liked it. Defendant made B. touch his penis, grabbing her hand and moving it up and down. She could not recall if his penis was erect. When defendant stopped touching her, she got out of bed and went into the bathroom until her mother returned from work. She did not say anything because she did not know any better.

On another occasion, in the Yuba City townhouse, B. sat on the living room couch. Her mother was in the kitchen and defendant stood on the staircase masturbating. When B. met his eye, defendant continued, but stopped and went upstairs when her

6

mother came out of the kitchen. When her mother went back into the kitchen, defendant came back downstairs and continued to masturbate. B. hid behind a recliner.

In another incident in Yuba City, B. was asleep in the upstairs bedroom she shared with A. She slept in the top bunk, A. in the lower bunk. B. wore a nightgown and underwear. Defendant came into the bedroom, got on the bunk bed ladder, and rubbed her vagina under her nightgown, but on top of her underwear.

Later, again in Yuba City, defendant put his hand under B.'s underwear and his fingers in her vagina while she slept in a bunk bed. She rolled over in an effort to stop him. The penetration lasted less than a minute but hurt her. She did not say anything. When A. "rustled around," defendant left. He told B. not to tell anyone or he would hurt her family. Afraid, she told no one.

Around the age of eight or nine, B. wrote her mother a note, telling her that defendant touched her. She wrote that she did not know what to do. When she was 10, her father asked if defendant had ever touched her. Out of fear, she denied the touching. In 2013, she took makeup and clothing from a store, admitted the theft, and returned the items.

B. was aware of defendant's molestation of Mi. and A. However, she never spoke to them about the incidents.

In September 2015, B. gave a statement to a deputy district attorney. She stated defendant married her mother when she was seven. While they lived in one of the apartments, defendant would wait until her mother was at work or out of the room and then make suggestive comments and grab her breasts. During one incident while her mother was at work, defendant came into her mother's bedroom while B. slept. Defendant digitally penetrated her with his finger. She told her mother about it after she learned of defendant's molestation of her sisters.

7

A few days earlier, A. gave a statement to a police officer, telling the officer that she, Mi., and B. had talked about defendant touching them. B. told the same officer defendant inserted his fingers into her vagina during an incident on the bunk bed.

**Uncharged Sexual Offenses**

*Mi.*

Mi., B. and A.'s older sister, was 28 at the time of trial. She lived with her mother and defendant in an apartment during seventh and eighth grade when she was 13. She slept on a pullout couch in the same room with defendant and her mother's bed, separated by sheets hung from the ceiling. During summer vacation and school breaks, A. and B. visited.

On the night of December 7, 1999, Mi. sat on a couch in the apartment watching television. Defendant sat nearby and began making "a weird noise" that sounded like "wet skin." She felt awkward and made noises to let defendant know she heard him. When she looked up, she saw defendant's hand moving up and down while touching his private area. She got up walked into the bathroom and shut the door.

Defendant tried to come into the bathroom, explaining he could not help it because she was so pretty. Mi. screamed at him to go away. She left the bathroom and walked to the kitchen where she grabbed something before returning to the bathroom. Agitated, defendant walked around. Her mother, asleep on the bed, did not wake up when Mi. screamed. Her mother had been taking pills at the time, which made her pass out.

When Mi. left the bathroom a few minutes later, defendant was gone. He left his wedding ring on the table and a note. When she was able to wake up her mother, she told her what happened. Her mother took her to live with relatives. Mi. told A. and B. about the incident. A. said defendant made her uncomfortable and B. said defendant had done similar things to her.

8

The parties stipulated defendant was convicted in May 2003 of a violation of section 314.1, subdivision (1), lewdly exposing himself in a public area where Mi. was present in 2000.

***T.***

T., 19 at the time of trial, was 10 years old when her father tried to help defendant. Defendant was homeless, and her father gave him work and brought him home.

In October 2007, she came home from school and found defendant in the living room with his computer. She saw a photograph of a man's penis on the screen. Defendant, T., and her father then drove to a football game. T. and defendant were passengers along with her younger sister. As they traveled, defendant held up his phone and showed T. the screen on which he typed: "I want to jack off while you watch me." He also showed her a photo of a man's penis on the phone. He wrote on his phone that she should text him and she knew his number. She told her father after the football game. He called the police and defendant was arrested.

T. admitted that at age 13 she hit her father with a bat during a fight. When she was 17 years old, a party she attended was broken up by police. In the process, she threatened and resisted an officer. Also at 17, she took a bottle of alcohol from a store, a theft she later admitted.

Officers seized defendant's cell phones, laptop, and a "Barely Legal" magazine. One phone contained a photograph of a boy and girl engaged in oral copulation. Another photograph was of a man exposing his penis. Defendant admitted to an officer that he had pictures of minors of a sexual nature and of his penis on his phone.

A forensic examination of the phones and laptop followed. One cell phone contained a series of pornographic images of children in sexually suggestive positions. The other cell phone had photographs of young girls in various stages of undress in sexually suggestive poses. Defendant's laptop contained photos of his penis. The parties

9

stipulated that defendant was convicted of violating section 311.11, subdivision (b), knowingly possessing photographs of minors simulating sexual conduct, in 2007.

**Expert Testimony**

An expert in child sexual assault accommodation syndrome, Dr. Blake Carmichael, testified that sexually abused children often delay reporting the abuse. Victims may initially deny the abuse, but reach out when they are older providing more details of the abuse. Children who have been abused may relay different details to different people, but not always.

Dr. Carmichael also discussed a child's concept of time. A child may remember core facts surrounding the sexual assault, but not specific details. If the abuse occurred frequently over a period of time a victim's memories of the details may be less clear. Not all victims react the same way to abuse. Victims may avoid identifying the perpetrator. Although victims are angry, they may love the perpetrator because they are family members. Children may feel helpless because they cannot make the abuse stop.

**Defense**

At trial, defendant denied touching the victims. According to defendant, his sexual victimization by family members when he was between the ages of six and 12 precluded him from harming other children. The sexual assaults, including forcible sodomy, caused him irreparable harm. As a result, defendant could not subject a child to such abuse and he was exceptionally cautious around them.

Defendant had no desire to touch children, but he did desire to expose himself. In 1994, defendant was convicted of exposure involving a child, when he "flashed" three girls, exposing his penis. In 1996, he was also convicted of indecent exposure when he "flashed" his penis to a 17-year-old girl. Defendant believed these exhibitionist tendencies stemmed from being molested when he was a child by a man. The molestations drove him to prove he was a man, a need which resulted in exposing himself

10

to others beginning at age 12.  Only therapy helped defendant understand the origins of his need to expose himself.

### *Defendant's Testimony Regarding Mi.*

Mi.'s mother knew of defendant's past when they married.  Mi. moved in with them shortly afterwards.  Defendant was reluctant to live with her because it violated his parole, but his wife insisted.  She took Mi. out of the apartment during parole checks.  Mi. knew about defendant's past.  Once, when a parole agent came, Mi. sat behind a sheet.

Mi. slept on the couch while defendant and his wife shared a bed.  A sheet separated them for privacy.  Once, after his wife took medication before sleeping, defendant became aroused and after he could not wake her up, sat at the foot of the bed and masturbated.  Mi. came out of the bathroom.  Although defendant hoped Mi. would go back to sleep, she poked her head around the curtain, saw defendant, and said, "oh, my God."  Defendant stated he was exposed but not masturbating when Mi. saw him.  Defendant's effort to speak to Mi. failed.  Defendant wrote a letter to his wife about the incident.  He told the police the truth when they questioned him.  Defendant pled guilty to indecent exposure in 2002, because he did not want to force Mi. and his wife to testify against one another.  The parties stipulated to a police department report in 2001, which stated Mi. walked in on defendant while he was masturbating.

Defendant admitted he had "flashed" Mi. a number of times because of a desire to do so before the masturbation incident.  He never masturbated in front of her because she was like a stepdaughter to him.

### *Defendant's Testimony Regarding A.*

After defendant and his wife married, A. and B. visited.  However, neither knew of his criminal history.

11

Defendant admitted exposing himself to A.  In the first incident, when she was 11 or 12, he showed her his penis while they sat at the table.  They talked about it and she had no reaction.  In another incident, defendant woke up and while getting ready for work began masturbating in front of her.  Defendant once exposed his penis to her while they rode in a truck; she did not seem to care.  According to defendant, A. seemed comfortable with him exposing himself, so he continued to do so.  He never touched her.  Defendant masturbated in front of her because she made it "available" to him and never told him to stop.

### *Defendant's Testimony Regarding B.*

Defendant never touched or exposed himself to B.  She was too young and he did not have those desires with her.  During the incident on the staircase, defendant was exposing himself to his wife, not B.  He did not know B. was hiding behind a chair.

### *Defendant's Testimony Regarding T.*

Defendant provided landscaping work for T.'s father and was at the house twice a day, five days a week for five months.  T's father knew about his past.  Defendant brought his computer every day and would look at and send pictures of his penis to his girlfriends.

The day defendant was arrested T. came into the room while he was on the computer.  She saw only the computer's back, not the screen.  Defendant denied showing her inappropriate photos or messages.  Because he had nothing to hide, defendant gave officers his computer and cell phone passwords.  He denied telling officers he had pornographic images on his phone or possessed child pornography.

Defendant pled to possessing child pornography on his phone in 2008 because he was facing 70 years in prison.  Instead, through the plea, defendant received only four

12

years. Although defendant had pictures of children on his phone, it was not child pornography. He had pictures of adult women on his phone.[2]

### *Defendant's Testimony Regarding M. and S.*

Defendant knew M. and S.'s parents. Their mother was defendant's ex-girlfriend and the mother of his daughter. She knew of defendant's past. They reconnected in 2012 and defendant became friends with M. and S.' father. Defendant and his girlfriend often visited the family's home.

Defendant played with M. and S. and they climbed all over him. However, he never touched them on the couch. They also played in the garage, but defendant denied touching M. Nor did he touch M. in a truck or in the backyard.

Defendant did not expose himself to either girl because he had grown out of being an exhibitionist. Therapy helped defendant overcome the desire to expose himself through confronting the molestations in his past.

In November 2014, defendant contacted Child Protective Services because he was concerned about M. and S.'s mother's treatment of their daughter. She became angry when she found out.

Just before Thanksgiving 2014, S. told defendant whenever someone touched her "tutu," she was supposed to tell her mother. S. was sitting on defendant's lap watching television in the living room. Everyone else was in the bedroom, except for S.'s father who was on the computer. S. continued to sit on his lap watching television. Defendant did not leave until the next day.

A social worker testified that in December 2014 she responded to M. and S.'s residence to investigate sexual abuse allegations. Their father told the social worker he contacted law enforcement as soon as he found out about the allegations. He also stated

---

[2] An officer testified he checked defendant's phone and there appeared to be a picture of a minor child, but no messages similar to what T. stated she saw.

13

he immediately spoke to S. after hearing her say she was supposed to tell her mother if someone touched her "tutu."

A few days after the social worker's visit, defendant learned of M.'s and S.'s accusations. He admitted making the phone call from jail that was played for the jury. He did not expect M. and S.'s mother to be on the phone. It was one of 400 phone calls he made. Defendant told their mother he was sorry because he was not supposed to talk with her and did not want to interfere with the investigation.

When defendant spoke to a detective about M.'s and S.'s accusations, the detective told him his DNA would be on the girls. Defendant was frightened because he knew it was not possible.

**Verdict and Sentencing**

The jury found defendant guilty on counts one through three, and five through nine. The jury found defendant not guilty on count four, but guilty of the lesser included offense of committing a lewd and lascivious act upon A. pursuant to section 288, subdivision (a). The jury also found true the special allegation that defendant committed a sex offense against two or more victims. (§ 667.61, subd. (e)(4).)

The court found five alleged prior prison terms to be true. The court sentenced defendant to consecutive terms of 25 years to life on counts one through three, and consecutive terms of 15 years to life on counts five, seven, eight, and nine. The court imposed an aggravated term of eight years on count four, and a consecutive term of two years on count six, for a total determinate term of 10 years. The court also imposed one year for each of the five prior prison term enhancements on each of the seven indeterminate counts, as well as on the determinate term, for a total of 40 years. Defendant's aggregate sentence included a determinate term of 50 years and an indeterminate term of 135 years to life. Defendant filed a timely notice of appeal.

14

## DISCUSSION

## I

### *Testimony About Victims' Reputation for Honesty*

Defendant argues the trial court erred in excluding his testimony concerning the reputations of Mi., T., B., and A. for honesty. The court's ruling violated defendant's constitutional rights, including his right to due process.

**Background**

Defense counsel asked defendant whether he had an opinion about Mi.'s "honesty or dishonesty." The prosecution objected, arguing lack of foundation and improper character evidence. The court sustained the objection. Defense counsel asked defendant whether Mi. had lied to him. The prosecution again objected and the court held an evidentiary hearing.

Outside the jury's presence, defense counsel argued the challenged testimony constituted evidence of truthfulness, motive, and knowledge to challenge the credibility of witnesses under Evidence Code section 1101, subdivision (c).

Defense counsel questioned defendant to lay a foundation for admissibility. Defendant testified he had known Mi. for three years. He heard her tell lies, although he did not remember the exact times. Defendant remembered her manipulating her mother about trying to get some sort of radio with headphones. He testified Mi. made things up to get the radio, but could not remember what.

Mi. also lied to her mother about taking care of her younger brother. Although she told her mother she was watching him, her father said she left her brother running around the front yard. On cross-examination, defendant conceded it was Mi.'s opinion against her father's opinion as to whether she had neglected her brother. Defendant could not identify any other lies by Mi., but believed she was deceptive.

15

According to defendant, T. played her parents off one another. As she lied to her parents, defendant would sit there and watch. She would look at him and smile. He could not remember any specific lies she told. However, in defendant's opinion, she lied. Defendant recalled a time when she threw a fit when her father told her she could not go to a game.

Defendant was not sure whether A. was dishonest, but she continually faked or exaggerated asthma attacks to get attention. She never had a real asthma attack.

B. also lied. On one occasion, she purposefully stepped on a thumb tack and screamed to her mother that it was an accident. Defendant described B. as very deceptive and dishonest.

The trial court found a lack of foundation for defendant to testify as to the honesty or dishonesty of the four girls.

**Discussion**

We review a trial court's evidentiary rulings for an abuse of discretion. (*People v. Fuiava* (2012) 53 Cal.4th 622, 663.) However, we review de novo whether the trial court's exclusion of evidence violated a defendant's constitutional rights. (*People v. Seijas* (2005) 36 Cal.4th 291, 304.)

Except as otherwise provided by statute, all relevant evidence is admissible. (Evid. Code, § 351.) The jury may consider in determining a witness's credibility any matter that has a tendency to prove or disprove the truthfulness of the testimony including the witness's character for honesty or veracity or the converse. (Evid. Code, §§ 210, 780, subd. (e); *People v. Taylor* (1986) 180 Cal.App.3d 622, 629.) A defendant must establish a sufficient foundation for the relevance of character testimony and the defendant's personal knowledge of the subject matter. (Evid. Code, § 403, subd. (a)(1), (2).) Character evidence is often based on personal knowledge or observation. (*People v. Lopez* (2005) 129 Cal.App.4th 1508, 1528.)

Defendant argues he "personally knew [Mi., T., B., and A.] He was familiar with them. He personally observed them deceive and lie. Mi. actually lied to her mother. [Defendant] sat and watched [T.] lie. [A.] deceptively lied to her mother and feigned her hyperventilating asthma attacks. He saw [B.] purposefully lie. [Defendant] 'witnessed it.' The defense established a sufficient foundation by a preponderance of the evidence so as to require admission of his opinion testimony."

We find defendant's claim to have established a foundation for the admissibility of this evidence to be problematic. Defendant stated he witnessed Mi. lying, but could not remember the timing or content of her lies. Nor could he give any specifics as to her lies about a radio. Although defendant claimed Mi. lied about taking care of her brother, he also acknowledged it could be considered a difference of opinion.

Similarly, defendant testified T. lied and deceived her parents, but could not recall the specific falsehoods. Instead, defendant presented his opinion that T. lied. Defendant agreed that T.'s reaction to not being allowed to go to a football game was about her being spoiled.

Defendant also equivocated concerning A.'s dishonesty. Although he testified she faked asthma attacks, he described her as an honest person.

Although defendant described B. as a liar, he could only point to the incident with the thumb tack. He later stated she was too young to lie.

Even assuming the court erred in denying defendant cross-examination on the issue of the victim's veracity, we find any error harmless. After reviewing the record, we conclude it is not reasonably probable the jury would have reached a more favorable verdict absent the error. (*People v. Watson* (1956) 46 Cal.2d 818, 836.)

The evidence defendant committed the crimes charged was substantial. M., S., A. and B. each testified that defendant sexually abused them. Defendant admitted exposing himself and masturbating in front of Mi. and A. Given the equivocal nature of the

17

character evidence defendant sought to admit, we cannot find its admission would have altered the result.

## II

### *Cross-Examination of Victims' Father*

Defendant sought to cross-examine M. and S.'s father as to whether he would drop the charges against defendant if he could. The court denied the request, a denial defendant contends was prejudicial and denied him his constitutional right to confrontation.

**Background**

At trial, M. and S.'s father described his friendship with defendant and defendant's biweekly visits to their home. During the visits, defendant spent time with his daughters. He described the incident with S. and defendant on the couch. He overheard S. talk about telling her mother when someone touches her "tutu," and then defendant left. When M. and S.'s parents later spoke to S. about her words, M. told them she had the same problem with defendant. Their parents notified the police a short time later.

During cross-examination, their father testified he never witnessed any misconduct between defendant and his daughters. He also stated that when they were young, M. and S. "were not very honest" and sometimes lied or exaggerated. He liked and missed defendant.

When asked by defense counsel, he said he would drop the charges against defendant if he could. The prosecution objected to the testimony as impermissible. Defense counsel argued the testimony went to M. and S.'s father's credibility and "how he look[ed] at this case." The court sustained the objection, admonished the jury to disregard the answer, and struck it from the record.

**Discussion**

Defendant argues the trial court erred in denying defendant the opportunity to cross-examine that M. and S.'s father said he would drop the charges if he could. The denial violated defendant's right to confrontation and cross-examination.

In determining the credibility of a witness, the jury may consider any matter that has a tendency in reason to prove or disprove the truthfulness of testimony. The existence or nonexistence of a bias, interest or other motive on the part of the witness is relevant to the truthfulness of a witness's testimony. (Evid. Code, § 780, subd. (f); *People v. Williams* (2008) 43 Cal.4th 584, 634.) We review the trial court's evidentiary rulings for an abuse of discretion. (*People v. Riggs* (2008) 44 Cal.4th 248, 290.)

Defendant contends the excluded cross-examination foreclosed him from exposing ulterior motives for M. and S.'s father's belated reporting of S.'s statement to the police and testifying as to its incriminating nature. In effect, defendant's cross-examination would have revealed their father would drop the charges because they were not true. "A reasonable juror might have received a significantly different impression of [M. and S.'s father's] credibility had defense counsel been permitted to pursue this proposed line of inquiry."

Given the speculative nature of defendant's argument, we cannot conclude the court abused its discretion in denying the requested cross-examination. Defense counsel had the opportunity to cross-examine M. and S.'s father on why he failed to report defendant's acts against M. and S. immediately. Nor is it clear that if he were inclined to dismiss the charges, why he would testify corroborating M. and S. unless it was the truth. We find no error.

19

## III

### *Admission of Evidence of Uncharged Sexual Acts*

Defendant contends the trial court erred in allowing propensity and disposition evidence to be introduced under Evidence Code section 1108, subdivision (a). According to defendant, the introduction of such evidence violated his right to a fair trial.

**Background**

Prior to trial, the prosecution filed a motion requesting evidence of uncharged acts by defendant be admitted. The acts sought to be admitted included the incident in 2000 when defendant masturbated in front of Mi. and the 2008 incident when defendant asked to masturbate in front of T. and showed her a picture of his penis.

The prosecution argued, under Evidence Code section 1108, subdivision (a), the uncharged crimes need not be sufficiently similar to the charged offenses and any dissimilarity went to the weight of the evidence not its admissibility. In addition, the uncharged conduct was not too remote in time. The prosecution also contended the acts were admissible under Evidence Code section 1101, subdivision (b), to establish intent, common plan, or scheme and to corroborate the victims' testimony. Moreover, the evidence was more probative than prejudicial under Evidence Code section 352.

In response, defense counsel argued the uncharged prior acts were inadmissible because they proved only bad character, violated his right to due process, were irrelevant and remote in time, and were more prejudicial than probative. Defense counsel also challenged admissibility under Evidence Code section 1101, subdivision (b), arguing the acts were not sufficiently similar to the charged offenses to permit inference of intent or establish a common plan or scheme.

The trial court held a hearing on the motion. The prosecution sought to introduce Mi.'s and T.'s testimony, evidence of convictions for both incidents, and testimony by the officer who found child pornography on defendant's computer and cell phone. Mi.'s

20

and T.'s testimony revealed defendant's attraction to young girls and his propensity for molesting young girls.

Defense counsel countered that the 2000 incident was too remote in time and the uncharged conduct was not substantially similar to the charged offense. In addition, propensity to commit one kind of act did not demonstrate propensity to commit another type of sex act. Defendant's 2002 plea did not necessarily prove the underlying facts.

The trial court granted the motion, finding the evidence of uncharged acts revealed a propensity for targeting young girls. Under the Evidence Code section 352 analysis, the court did not find the evidence cumulative or prejudicial. Although the uncharged acts did not constitute the same crime, there were distinctive similarities since all the crimes involved young girls. The uncharged crimes tended to invoke emotion, however, they were no more inflammatory than the charged acts. The actual convictions decreased any potential prejudice because they eliminated the risk that the jury would punish defendant for the uncharged acts.

Defendant argued his conviction for child pornography found on his cell phone should be excluded as separate and distinct from his actions with T. The court found the pornography substantially probative because it involved children, and all the victims were children. In addition, the court found both the conduct that did not result in conviction, his acts with T., and the conviction admissible because both had substantial probative value and were no more inflammatory than the charged offenses.

The prosecution also requested the evidence of uncharged conduct be admitted on the issue of intent under Evidence Code section 1101, subdivision (b). The prosecution argued defendant's intent to satisfy himself was the same in both the charged and uncharged offenses and the uncharged offenses revealed a common scheme to seek out the children of friends and family members. Defendant argued intent was not an issue because he contended the touching never took place and there was insufficient similarity between the charged and uncharged conduct.

21

The trial court also admitted the evidence under Evidence Code section 1101, subdivision (b), but only for the purpose of showing defendant's intent. Mi. and T. testified regarding defendant's uncharged conduct. Evidence of the resulting convictions and defendant's possession of child pornography on his cell phone were also admitted at trial.

**Discussion**

In general, evidence of a defendant's uncharged conduct is not admissible to prove that the defendant has a criminal disposition or propensity. (Evid. Code, § 1101, subd. (a); *People v. Kipp* (1998) 18 Cal.4th 349, 369.) But Evidence Code section 1108 provides that when a defendant is charged with a sexual offense, evidence of the defendant's other sexual offenses is not made inadmissible by Evidence Code section 1101 if the evidence is not inadmissible under Evidence Code section 352.

The Legislature, in enacting Evidence Code section 1108, recognized that "sex crimes are usually committed in seclusion without third party witnesses or substantial corroborating evidence. The ensuing trial often presents conflicting versions of the event and requires the trier of fact to make difficult credibility determinations." (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1160; *People v. Falsetta* (1999) 21 Cal.4th 903, 911 (*Falsetta*).) Evidence Code section 1108 allows the trier of fact to consider uncharged sexual offense evidence as evidence of the defendant's propensity to commit sexual offenses in evaluating the defendant's and the victim's credibility and in deciding whether the defendant committed the charged sexual offense. (*Villatoro, supra*, at pp. 1160, 1164, 1166-1167; *Falsetta, supra*, at pp. 911-912, 922.)

In addition, uncharged sexual conduct evidence is admissible if the probative value of the evidence is substantially outweighed by the probability its admission will necessitate undue consumption of time or create substantial danger of undue prejudice, of confusing the issues, or misleading the jury. (Evid. Code, §§ 352, 1108, subd. (a).)

The Supreme Court has provided guidance on the admissibility of prior sexual offenses: "Rather than admit or exclude every sex offense a defendant commits, trial judges must consider such factors as its nature, relevance, and possible remoteness, the degree of certainty of its commission and the likelihood of confusing, misleading, or distracting the jurors from their main inquiry, its similarity to the charged offense, its likely prejudicial impact on the jurors, the burden on the defendant in defending against the uncharged offense, and the availability of less prejudicial alternatives to its outright admission, such as admitting some but not all of the defendant's other sex offenses, or excluding irrelevant though inflammatory details surrounding the offense." (*Falsetta, supra*, 21 Cal.4th at p. 917.)

We review the trial court's Evidence Code section 352 determination under the deferential abuse of discretion standard. (*People v. Avila* (2014) 59 Cal.4th 496, 515.) We will not reverse unless the trial court exercised its discretion in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice. (*People v. Hovarter* (2008) 44 Cal.4th 983, 1004.)

Defendant argues "Irrelevant, dissimilar acts of voyeurism and exhibitionism from indecent exposure, annoying a child with sexual content, and possession of child pornography did not rationally prove propensity and disposition to touch. [Citations.] The erroneous evidence did little more than show defendant was a sex offender." He also contends the prior acts from 2000 and 2008 were remote and the testimony of the four girls involved an undue consumption of time.

Defendant relies on *People v. Harris* (1998) 60 Cal.App.4th 727 (*Harris*), *People v. Jandres* (2014) 226 Cal.App.4th 340 (*Jandres*), and *People v. Earle* (2009) 172 Cal.App.4th 372 (*Earle*) to underscore the lack of similarity between the charged and uncharged offenses. We find these cases distinguishable.

In *Harris*, the defendant, a mental health nurse, was charged with assaulting two patients in 1995. In 1972, the defendant had been convicted of first degree burglary with

23

infliction of great bodily injury. The defendant had entered a woman's apartment, beat her unconscious, and inflicted extensive injuries on her vagina and rectum. During the trial on the 1995 charges, the prosecution introduced a redacted description of the prior crime, describing the victim's injuries and the fact that the defendant had been found nearby with blood on his clothes and person. (*Harris, supra*, 60 Cal.App.4th at pp. 730-735.) The appellate court found the evidence should have been excluded under Evidence Code section 352: "This altered version of a 23-year-old act of inexplicable sexual violence while heavy with 'undue prejudice' and dangerous in the hands of the jury was not particularly probative of the defendant's predisposition to commit these 'breach of trust' sex crimes." (*Harris, supra*, at pp. 740-741.)

In *Jandres*, the defendant was charged with forcible rape and kidnapping to commit rape. The uncharged act took place during an attempted burglary. The defendant lifted a girl off a couch and dropped her. He also briefly shoved his finger in her mouth. (*Jandres, supra*, 226 Cal.App.4th at pp. 343, 349) The appellate court found the evidence improperly admitted, noting the differences between the circumstances surrounding the two crimes, the different ages of the victims, and the different nature of the conduct. The court conclude evidence that the defendant exhibited sexual interest in an 11-year-old girl by fingering her in the mouth did not support an inference that he was predisposed to rape an 18-year-old woman. (*Id.* at p. 356.)

Finally, in *Earle* the trial court denied the defendant's motion to sever a misdemeanor indecent exposure charge from a completely unrelated felony sexual assault charge. The appellate court found the exposure charge, which was the stronger of the two charges, possessed the potential to inflame the jury. Joining the charges prejudiced the defendant since he would not have been found guilty of assault absent the exposure charge. (*Earle, supra*, 172 Cal.App.4th at pp. 378, 401-402, 409, 412.)

In the present case, the trial court considered the uncharged acts and found they shared common characteristics with the charged acts. All defendant's actions were

perpetrated against similar victims:  young girls who defendant knew and took advantage of a position of trust in order to commit the crimes.  Unlike the cases cited by defendant, the uncharged and charged conduct were neither dissimilar nor unconnected.  The similarities cited by the trial court supported the inference that defendant had a propensity to commit sex offenses, including the charged crimes.

Nor are we convinced by defendant's contention that the uncharged conduct was more prejudicial than probative under Evidence Code section 352.[3]  Our review of the uncharged evidence admitted by the trial court reveals it had substantial probative value, did not confuse the issues, and was not more inflammatory than the charged offenses.  In addition, the trial court instructed the jury that the uncharged offenses alone did not constitute sufficient proof defendant was guilty of the charged offenses.  The instruction informed the jury it had to find defendant guilty of the charged offenses beyond a reasonable doubt.

## IV

### *Senate Bill No. 136*

We granted defendant's request to submit supplemental briefing to address the trial court's imposition of prior prison term enhancements under Senate Bill No. 136 (2019-2020 Reg. Sess.).  Defendant contends the enhancements must be stricken and the matter remanded to the trial court under the "full resentencing" rule.  The People agree that the prior prison term enhancements must be stricken but argue remand is unnecessary because the trial court imposed the maximum sentence.  We agree with the People.

Under section 667.5, subdivision (b), the trial court imposed five one-year

---

[3] Defendant points out that the jurors requested the testimony of A., B., S., and M. as well as defendant's testimony regarding M. and S.  Defendant contends the jurors' requests indicate it was a close case.

enhancements for prior prison terms defendant served for a conviction of second degree burglary, three convictions for indecent exposure, and a conviction for possession of child pornography. The court added five years to each of the seven counts on which defendant was sentenced to an indeterminate term and one five-year enhancement for the two counts where defendant was sentenced to a determinate term, for a total of 40 years. (See *People v. Garcia* (2008) 167 Cal.App.4th 1550, 1559-1561.)

Section 667.5, subdivision (b), formerly provided in relevant part that "where the new offense is any felony for which a prison sentence or sentence of imprisonment in a county jail . . . is imposed or is not suspended, in addition and consecutive to any other sentence therefor, the court shall impose a one-year term for each prior separate prison term . . . for any felony . . . ." Senate Bill No. 136, signed by the Governor on October 8, 2019, amended this provision to substitute "a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code" in place of "any felony." This amendment was effective January 1, 2020. (Stats. 2019, ch. 590, § 1.) None of defendant's prior prison terms was served for an offense listed in the definition of a "sexually violent offense" in Welfare and Institutions Code section 6600, subdivision (b).

We assume, absent a clear indication to the contrary, that the Legislature intended an "amended statute to apply to all defendants whose judgments are not yet final on the statute's operative date." (*People v. Brown* (2012) 54 Cal.4th 314, 323; *In re Estrada* (1965) 63 Cal.2d 740, 742-748; *People v. Lopez* (2019) 42 Cal.App.5th 337, 341-342 (*Lopez*).) Defendant's judgment is not final on appeal and therefore he benefits from Senate Bill No. 136. (*Lopez, supra*, at p. 342.) Accordingly, the trial court's sentences imposed under former section 667.5 must be stricken.

Defendant argues that, under the "full resentencing" rule, the case should be remanded for the court to reconsider all components of his sentence. "[W]hen a part a of sentence is stricken on review, on remand for resentencing, 'a full resentencing as to all

26

counts is appropriate, so the trial court can exercise its sentencing discretion in light of the changed circumstances." (*People v. Buycks* (2018) 5 Cal.5th 857, 893.) However, remand for resentencing is not required where the trial court has imposed the maximum possible sentence. (*Id.* at p. 896, fn. 15; *Lopez, supra*, 42 Cal.App.5th at p. 342.) Here, the trial court imposed the maximum sentence.

The prior prison term enhancements totaling 40 years will be stricken.

## V

### *One Strike Law*

In another round of supplemental briefing, defendant contends that the People's failure to plead the multiple victims enhancement under section 667.61, subdivision (j)(2), of the One Strike law violated his due process right to notice when the trial court imposed 25-year-to-life sentences on counts one through three for lewd and lascivious acts with a child under 14 (§ 288, subd. (a)).

The third amended information alleged a multiple victims enhancement under section 667.61, subdivision (e)(4), not (j)(2). The jury found true the allegation that defendant committed a sex offense against multiple victims within the meaning of section 667.61, subdivision (e)(4). Nonetheless, the People contend that defendant received fair notice. Again, we agree with the People.

The difference between the multiple victims allegation in section 667.61, subdivision (e)(4) and section 667.61, subdivision (j)(2), of the One Strike law is that the former generally leads to a sentence of 15 years to life and the latter 25 years to life. (§ 667.61, subds. (b), (j)(2).) Defendant relies on *People v. Jimenez* (2019) 35 Cal.App.5th 373, which held that pleading section 667.61, subd. (e)(4) does not give constitutionally adequate notice that the defendant may receive the longer sentence under 667.61, subdivision (j)(2).

The court in *In re Vaquera* (2019) 39 Cal.App.5th 233, review granted November 26, 2019, S258376 (*Vaquera*) rejected *Jimenez*, and *People v. Zaldana* (2019)

43 Cal.App.5th 527, review granted March 18, 2020, S259731, agreed with *Vaquera*. (*Vaquera, supra*, at p. 242; *Zaldana, supra*, at p. 533.) *Vaquera* held that the defendant had adequate notice that he would be sentenced under section 667.61, subdivision (j)(2), even though he was charged under section 667.61, subdivision (e)(4). In that case, as here, the defendant was charged with violations of section 288, subdivision (a), lewd and lascivious acts with a child under 14, involving multiple victims. (*Vaquera, supra*, at pp. 236, 240-241.)

Subdivision (b) of section 667.61 provides that any person who commits one of the enumerated offenses in subdivision (c) of the statute, which includes section 288, subdivision (a), under one of the circumstances set forth in subdivision (e), which includes subdivision (e)(4) involving multiple victims, is subject to a default 15-year-to-life sentence. Subdivision (j)(2) provides that any person who commits one of the enumerated offenses in subdivision (c) under the circumstances set forth in subdivision (e) with a victim under 14 is subject to a 25-year-to-life sentence.

*Vaquera* concluded that the defendant, as here, was on notice that he could receive the longer sentence because the pleading alleged the victims were under 14. (*Vaquera, supra*, 39 Cal.App.5th at pp. 240-241, review granted [" 'the language of the pleading itself—irrespective of the statutory specification—should have alerted the defendant he faced the increased enhancement term,' " quoting *People v. Thomas* (1987) 43 Cal.3d 818, 831].) Indeed, there is no difference between the application of section (e)(4) and section (j)(2) of the One Strike law, if the offense alleged is section 288, subdivision (a), which by definition involves a child under 14. A defendant charged with violating this provision with multiple victims falls under subdivision (j)(2) in every instance.

Therefore, we conclude that defendant received fair notice.

## DISPOSITION

The prior prison term enhancements imposed under section 667.5, subdivision (b), are stricken. The trial court is directed to issue a corrected abstract of judgment reflecting this modification and forward a certified copy to the Department of Corrections and Rehabilitation. The judgment is otherwise affirmed.

       /s/       
RAYE, P. J.

We concur:

    /s/     
HULL, J.

    /s/     
ROBIE, J.